UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| **TARA SANDERS** *on behalf of* **K.S.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  CAUSE NO. 1:15-cv-00232-SLC |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** *sued as Nancy A. Berryhill,* | ) |
| *Social Security Administration,*[1] | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff Tara Sanders, on behalf of K.S., a minor, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying K.S.'s application for Supplemental Security Income ("SSI").[2] (DE 1). For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Sanders applied on K.S.'s behalf for SSI in April 2012, alleging disability as of March 30, 2012 (DE 9 Administrative Record ("AR") 24, 121-29); the Commissioner denied the application initially and upon reconsideration (AR 70-73, 77-82). A hearing was held on September 18, 2013, before Administrative Law Judge Maryann S. Bright ("the ALJ"), at which K.S. and Sanders, who were represented by counsel, testified. (AR 45-67). On February 18,

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, — F.3d —, 2017 WL 398309 (7th Cir. Jan. 30, 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

2014, the ALJ rendered an unfavorable decision, concluding that K.S. was not disabled. (AR 24-39). The Appeals Council denied Sanders's request for review, at which point the ALJ's decision became the final decision of the Commissioner. (AR 1-6).

Sanders on behalf of K.S. filed a complaint with this Court on August 24, 2015, seeking relief from the Commissioner's final decision. (DE 1). Sanders advances just one argument in this appeal—that the ALJ improperly found that K.S. did not meet or equal Listing 114.02(A), the listing for Systemic Lupus Erythematosus ("SLE"). (DE 19 at 7-9).

## II. FACTUAL BACKGROUND[3]

### A. K.S's Testimony at the Hearing

Sanders alleges that K.S. is disabled due to SLE with resulting arthritis and kidney disease. (DE 19 at 2). At the time of the hearing, K.S. was 11 years old and in the sixth grade; he rode the bus to school. (AR 49, 55-56). He stated that he had no problems with using a computer, writing, or completing his homework. (AR 50, 53). After school, he watches television or plays with his siblings. (AR 51). He helps with household tasks, such as using a knife to cut vegetables. (AR 53-54). K.S. stated that he can run and jump, but that his legs start hurting afterward. (AR 51-52). He reported that he is good at throwing and catching a ball, but his arm sometimes "locks up sideways," though this had never happened at school. (AR 52). He enjoys playing laser tag and has no problems with kicking. (AR 53). He was planning on trying out for the school basketball team; he also wanted to participate in cross country, but thought that he probably would not be able to do that. (AR 52-53).

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 381-page administrative record necessary to the decision.

### B. *Sanders's Testimony at the Hearing*

Sanders reported that K.S. was diagnosed with SLE in March 2012. (AR 56). When asked how K.S. is different from other children his age, Sanders responded that he cannot play contact sports such as football. (AR 56). She added that while he can play and have a good time during the day, by the end of the day she might have to carry him upstairs because he cannot walk (AR 56, 62); she also said that some mornings he wakes up and cannot walk. (AR 56). Sanders acknowledged that K.S. was "doing well" with his medications (prednisone, methotrexate, naproxen, and plaquenil) without any report of side effects, but stated that he still has some bad days when he complains of aches and pains or swelling. (AR 56-58). She had taken him to the emergency room on several occasions for various complaints. (AR 57).

Sanders stated that K.S. is able to perform his own self care; help with household chores; and walk, run, jump, and climb. (AR 59). But she tries to not let him do too much, concerned that if he does, "he's going to be hurting" later. (AR 59). She clarified, however, that there are times that he goes for walks and does not experience pain later. (AR 59). She estimated that he has two to four "flare-ups" a week, where he doesn't feel well, has a reduced appetite, and has pain and swollen joints. (AR 60). However, he had missed just one day of school in the sixth grade and "a few days" in the fifth grade.[4] (AR 57, 63). She stated that sometimes he has swelling in his fingers, but then conceded that "he ha[d]n't really had too much of that." (AR 60). He was not receiving any special services at school, other than that Sanders had requested one of his teachers keep K.S.'s books in the classroom so that he did not have to carry them. (AR 60-61). Sanders agreed that K.S. has no learning problems, that he gets along well with

---

[4] A sixth grade school report reflects that K.S. had three excused absences and one unexcused absence. (AR 189).

3

others, and that he completes his homework. (AR 61-62).

### C. *Summary of the Relevant Medical Evidence*

On March 13, 2012, K.S. was seen at the St. Joseph Medical Group for a rash and swelling. (AR 215-23). He complained of chest pain and congestion; he did not have a fever. (AR 215-17).

On March 23, 2012, K.S. saw Dr. Susan Ballinger, a pediatric rheumatologist at Riley Hospital for Children ("Riley"), for a two-month history of joint pain and swelling. (AR 234). He had also complained of increased fatigue and a recent fever of 103 degrees. (AR 234). His symptoms included progressive swelling throughout the day, mostly around his knees. (AR 234). He was hospitalized for one week. (AR 234, 367). Laboratory testing revealed that his ANA was high and that his C3 and C4 were both low. (AR 235). Dr. Ballinger suspected SLE. (AR 234).

At a follow-up examination on April 4, 2012, Dr. Ballinger noted that K.S. had stiff fingers, pain on wrist flexion and extension, right elbow swelling, and ankle swelling bilaterally with decreased subtalar motion. (AR 275). Otherwise, he had a normal gait, full range of motion, no swelling or tenderness, normal strength, and no rash or lesions. (AR 275). Dr. Ballinger's impression was SLE, and she prescribed prednisone. (AR 275). Two weeks later, on April 19, 2012, Dr. Ballinger indicated that K.S. had "been doing great since his last visit." (AR 271). He was without new complaints, other than some nausea in the morning. (AR 271). On exam, K.S. had trace swelling in his knees bilaterally, but otherwise he had full range of motion, a normal gait, and no swelling or tenderness. (AR 272). A physical therapy evaluation that same day revealed no functional limitations, though he did have some swelling in his middle

4

fingers and left knee, poor hand strength, decreased grip, and reduced finger flexion. (AR 261). He told his physical therapist that he had been doing better since taking medications. (AR 261).

In May 2012, K.S. was seen by Dr. Kathleen O'Neil, chief pediatric rheumotologist at Riley. (AR 257). She noted that K.S. had developed nausea and diarrhea in the last week but that it had resolved within 48 hours. (AR 257). He was feeling much better and was "nearly back to normal," although his mother worried that he was sleeping more and not playing quite as much as usual; his mother suspected, however, that K.S.'s decreased interest in playing was related to their recent move. (AR 257). He had no fevers but did have some night sweats; he had experienced some weight gain since starting on prednisone. (AR 257). His only joint complaint was intermittent anterior knee pain when playing on his knees with his baby brother; otherwise, all of his joint complaints had resolved. (AR 257). On exam, K.S. showed no abnormalities other than skin irritation. (AR 257-58). Dr. O'Neil's impression was SLE with probable early renal involvement. (AR 258). She noted that he was on a very high dose of prednisone, which she hoped to taper somewhat. (AR 258).

Also in May 2012, Dr. Steven Roush, a state agency physician, reviewed K.S.'s record and completed a childhood disability evaluation form. (AR 237-42). Dr. Roush concluded that K.S. had a severe impairment but that it did not meet or equal a listing. (AR 237). Dr. Roush found a "Less Than Marked" limitation in the domain of health and physical well-being, but no limitation in any of the other five domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for yourself. (AR 237-40). He noted that K.S. was responding to medications and had been doing great since April 19, 2012. (AR 240).

5

In early June 2012, K.S. saw his pediatrician, reporting that he had "lots of pain." (AR 330). His prednisone dosage was being weaned down. (AR 330).

In late June 2012, K.S. saw Dr. Sharon Andreoli, a pediatric nephrologist at Indiana University. (AR 367-68). K.S. reported fatigue, back pain, leg pains, and nosebleeds. (AR 367). His mother stated that his activity level had been significantly decreased since being diagnosed with SLE. (AR 367). A physical exam was unremarkable. (AR 367). Laboratory testing revealed a normal protein-creatinine ratio, normal renal function, normal blood pressure, and no hematuria. (AR 368).

On July 2, 2012, K.S. returned to Dr. Ballinger, reporting that he had been doing well in terms of his joint pain and swelling. (AR 264). He had no fever, weight loss, or similar symptoms. (AR 264). He had been weaning from his prednisone pursuant to the doctor's weaning schedule. (AR 264). He had been complaining of some low back pain in the past few days, mostly at night. (AR 264). His mother thought that his knees looked a little swollen, but he had no joint pain and no significant medication side effects. (AR 264). Dr. Ballinger found that he was "doing well overall." (AR 265).

On July 11, 2012, Dr. Ballinger wrote a letter to the state agency noting K.S.'s diagnosis of SLE and his two major symptoms of SLE—arthritis and kidney disease. (AR 304). She indicated that he had "some limitations of his activity because of back pain from his arthritis," and that he "missed days of school last school year" due to his SLE. (AR 304). Due to concerns about his developing further symptoms, she stated that she would continued to carefully monitor K.S. (AR 304).

On July 12, 2012, Dr. Joseph Gaddy, a state agency physician, reviewed K.S.'s record

6

and concluded that his impairment or combination of impairments did not meet or equal a listing. (AR 305). He indicated that K.S. had marked limitations in the health and physical well-being domain, but no limitations in the remaining five domains. (AR 308). He indicated that K.S. had responded very well to steroids and was in the process of beginning treatment with methotrexate. (AR 308).

On or about July 24, 2012, K.S. complained to his pediatrician of back pain and swelling in his hands and feet. (AR 328). She noted that he appeared stiff as he walked. (AR 328).

On July 30, 2012, Dr. Ballinger observed that K.S. had been doing well with weaning from prednisone and that he was tolerating his medications well. (AR 315). He was having a little bit of knee pain when kneeling but was without morning stiffness. (AR 315). She noted that he had a normal gait and full range of motion, documenting that he was "doing well overall." (AR 316).

On August 23, 2012, K.S. complained to his pediatrician of arthralgias and leg pain. (AR 327). On exam, he was without joint swelling or redness. (AR 327).

On August 27, 2012, Dr. Ballinger again indicated that K.S. "ha[d] been doing well overall." (AR 313). He continued to have some joint pain, so his mother had not weaned his prednisone below one-half teaspoon. (AR 313). He demonstrated a normal gait, 5/5 strength, and full range of motion. (AR 314). He had no fever or weight loss. (AR 313-14).

On January 29, 2013, Dr. Ballinger again wrote that K.S. had been doing well overall. (AR 311). He complained of some shoulder pain, but he had played laser tag a few days earlier in which he held a very heavy armor shield. (AR 311). He was without any systemic symptoms and was performing all of his daily activities independently. (AR 311). He denied any fever or

weight loss, and a physical examination was unremarkable. (AR 311-12).

On March 4, 2013, K.S. was seen at the emergency room for a fever. (AR 317-22). He described right leg pain that impeded his ability to walk and to dress himself. (AR 317). An exam revealed no significant abnormalities; chest X-rays were normal, and his temperature was 98.5 degrees. (AR 317-22). He was diagnosed with an upper respiratory infection. (AR 320). On May 21, 2013, K.S. saw his pediatrician for congestion and shortness of breath with activities. (AR 363).

On June 27, 2013, Dr. Ballinger noted that K.S.'s methotrexate had been increased after experiencing a flare of his arthritis in February. (AR 350). She also noted that he had an episode of shortness of breath, which was thought to be a panic attack, in March. (AR 350). She noted that he had gone to the emergency room several times for joint pains. (AR 350). He was currently complaining of dry eyes, sore throat, and pain in his left knee, both ankles, and groin. (AR 350). On exam, K.S. reported pain in full extension of his left knee; otherwise he had full range of motion without tenderness. (AR 351). He denied fever or weight loss. (AR 350). Dr. Ballinger indicated that K.S. needed to wean from prednisone and maximize his methotrexate. (AR 351).

On August 17, 2013, K.S. was seen at the emergency room for complaints of fatigue, right eye pain, and some epigastric pain. (AR 341). He had a low-grade temperature of 99 degrees. (AR 341-42). He reported some intermittent knee soreness. (AR 341). He had been playing football and experienced eye pain after exposure to sunlight. (AR 341). On exam, he was positive for arthralgias, but negative for joint swelling or gait problems; he had slight swelling in both knees. (AR 342). The doctor noted that K.S. appeared well clinically and that it

8

was unclear whether he had the beginning of a viral-type infection or possibly a flare of his SLE. (AR 343).

On August 26, 2013, Dr. Ballinger indicated that K.S. had been doing a little better in terms of his arthritis since starting on injectable methotrexate. (AR 344). He denied fever, weight loss, or similar symptoms. (AR 344). His mother noted that he had some intermittent knee pain and intermittent headaches and that she had taken him to the emergency room for these complaints. (AR 344). He had started back to school in the sixth grade and was doing well. (AR 344). After an examination, Dr. Ballinger indicated that K.S. "look[ed] good on exam" and that he was "feeling better clinically." (AR 346).

On September 12, 2013, K.S. was seen at the emergency room for complaints of chest pain, throat pain, and pain in his right calf. (AR 372). His mother said that he had been outside playing and came inside complaining that his chest and jaw hurt. (AR 373). His problem list included bilateral leg pain, weakness, rash to lower extremities, SLE, joint pain, acute upper respiratory infection, and chest pain. (AR 374). However, on exam, his skin was clear and without a rash, he had clear and equal breath sounds, and his respirations were unlabored. (AR 375). He demonstrated full range of motion and normal strength. (AR 375). He was discharged with instructions to follow up with his primary care provider. (AR 376).

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether

9

the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV. ANALYSIS

### A. *The Law*

To be disabled for purposes of SSI benefits, a child "must have a 'physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (quoting 42 U.S.C. § 1382c(a)(3)(C)(i)). The Social Security Administration has adopted a three-step process for determining whether a child is disabled. *Id.*; 20 C.F.R. § 416.924.

"First, if the child is engaged in substantial gainful activity, his or her claim is denied." *Brindisi*, 315 F.3d at 785 (citing 20 C.F.R. § 416.924(a)). "Second, if the child does not have a medically determinable 'severe' impairment or combination of impairments, then his or her claim is denied." *Id*. (citing 20 C.F.R. § 416.924(a)). "Finally, for a child to be considered

10

disabled, the child's impairment(s) must meet, medically equal, or functionally equal the requirements of a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App.1." *Id.* (citing 20 C.F.R. § 416.924(a)). "To find an impairment functionally equivalent to a listing, an ALJ must analyze its severity in [six] age-appropriate categories and find an 'extreme' limitation in one category or a 'marked' limitation in two categories." *Id.* (citing 20 C.F.R. § 416.926a(a)). "The applicant bears the burden of proof at each step of the process." *R.J. ex rel. Taylor v. Colvin*, No. 1:11-cv-01001-SEB-DKL, 2014 WL 1328166, at *2 (S.D. Ind. Mar. 28, 2014).

### B. The ALJ's Decision

On February 18, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 24-39). She found at step one of the three-step analysis that K.S. was a "school-age child" under 20 C.F.R. § 416.926a(g)(2) and that he had not engaged in substantial gainful activity after his SSI application date. (AR 27). At step two, the ALJ concluded that K.S.'s SLE with resulting arthritis and kidney disease were severe impairments. (AR 27). The ALJ determined at step three, however, that K.S.'s impairment or combination of impairments were not severe enough to meet or medically equal a listing (AR 27-29) or to functionally equal a listing (AR 29-39). Accordingly, K.S.'s claim for SSI was denied. (AR 39).

### C. The ALJ's Determination that K.S. Did Not Meet or Equal Listing 114.02(A) Is Supported by Substantial Evidence

Sanders's sole argument on appeal is that the ALJ improperly concluded that K.S. did not meet or equal Listing 114.02(A), the listing for SLE. Contrary to Sanders's assertion, the ALJ's conclusion is supported by substantial evidence.

"A child's impairment meets a listed condition only when it satisfies all of the criteria of the Listing." *R.J. ex rel. Taylor*, 2014 WL 1328166, at *2 (citing 20 C.F.R. § 416.925(c)(3) and

11

(d)). In order to meet Listing 114.02(A), a claimant must produce objective medical evidence of a diagnosis of SLE, with:

    A. Involvement of two or more organs/body systems, with:

        1. One of the organs/body systems involved to at least a moderate level of severity; and

        2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. § 404, Subpart P, App'x 1, 114.02(A).

Here, the ALJ found that the medical evidence of record supports a diagnosis of SLE, as noted by several medical sources of record, satisfying the first element of the listing. (AR 27; *see, e.g.*, AR 235, 240, 258, 304, 308). As to the second element, the ALJ concluded that the SLE involved two or more organs or body systems in that the medical evidence also revealed diagnoses of arthritis and kidney disease, two major symptoms of SLE. (AR 27; *see* AR 304, 310). Next the ALJ observed that K.S. was taking very powerful drugs, including methotrexate, steroids, and plaquenil, which demonstrated that his joints were involved at least to a moderate degree of severity, satisfying the third element of the listing. (AR 27). Thus, the ALJ observed that K.S. met the first three elements of Listing 114.02(A).

Ultimately, however, the ALJ found that K.S. did not meet the final element of the listing, in that the medical evidence did not reflect at least two of the constitutional symptoms or signs—severe fatigue, fever, malaise, or involuntary weight loss. As such, the ALJ concluded that K.S. did not meet or equal Listing 114.02(A). K.S. disputes the ALJ's finding concerning the fourth element of the listing, asserting that the record *does* reflect constitutional symptoms of

severe fatigue, fever, and malaise.[5] The Court will discuss the evidence of these three symptoms, beginning with fever.

Fevers are not defined by the listing, but courts have found that listing-level severity was not met where the claimant suffered from only periodic fevers and did not suffer from fevers to an extreme degree or for any prolonged period time. *See Martinez v. Colvin*, No. ED CV 12-0564 JCG, 2013 WL 4500463, at *2 (N.D. Cal. Aug. 21, 2013) (finding that the claimant did not meet the listing where she had periodic fevers "but did not suffer fevers for any prolonged period of time"); *Osborn v. Astrue*, No. 1:09CV0493, 2010 WL 3769112, at *8 (S.D. Ohio Aug. 19, 2010) (finding that the claimant did not meet the listing where "the presence of fever was relatively constant, but not to any extreme degree). When considering the evidence of record pertaining to fevers, the ALJ observed that K.S. had reported a fever of 102 or 103 degrees in March 2012, which then prompted a rheumatology consultation at Riley; however, the assessment at Riley indicated that he did not have a chronic fever. (AR 28 (citing AR 234)). The ALJ further considered that K.S. visited the emergency room twice with some allegations of fevers, first in March 2013 and then in August 2013, but neither visit revealed an abnormally high fever, as his temperature was 98.5 degrees and 99 degrees, respectively. (AR 28 (citing AR 317, 342)). Similarly, the ALJ noted that at visits to the emergency room in March 2012 for ankle swelling and in September 2013 for chest pain, K.S.'s temperature was 98.3 degrees and 97.5 degrees, respectively. (AR 28 (citing AR 334, 369, 372)).

The ALJ also considered Sanders's testimony pertaining to fevers. She testified that two weeks before the hearing K.S. had a fever in the middle of the night that rose to 100.6 degrees,

---

[5] Sanders does not argue that the record reflects involuntary weight loss.

which "broke" after showering and taking Naproxen. (AR 27 (citing AR 63-64)). When questioned specifically about the frequency with which K.S. experienced any fever, Sanders denied that K.S. experienced fevers more than just occasionally. (AR 27 (citing AR 64)). The ALJ, after considering both the objective medical evidence of record and Sanders's testimony, concluded that "the evidence does not support any reasonable frequency of abnormally high temperatures." (AR 28).

Sanders generally disputes the ALJ's conclusion that K.S.'s fevers did not satisfy the listing, but she does not point to any actual evidence of fever that the ALJ overlooked or that the ALJ unfairly considered. Thus, aside from this broad assertion of fevers, the ALJ's conclusion regarding the actual evidence of fevers remains unchallenged by Sanders. The ALJ reasonably considered the evidence and testimony of record concerning fevers, building an accurate and logical bridge to her conclusion that the fevers did not rise to listing-level severity. *See Clifford*, 227 F.3d at 872 (The ALJ "must build an accurate and logical bridge from the evidence to [her] conclusion." (citations omitted)); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (stating that the ALJ's decision must demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion). As such, the ALJ's conclusion that the evidence of fevers in the record does not rise to listing-level severity is amply supported.

Moving on, "severe fatigue" in the context of Listing 114.02(A) means "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function." 20 C.F.R. § 404, Subpart P, App'x 1, 114.00C(2). The ALJ considered that there were two reports of some fatigue in the record. Specifically, the ALJ noted that K.S. reported fatigue in March 2012, when he first reported symptoms and was diagnosed with SLE, and again in August 2013

14

after being out in the sun at a football game. (AR 28 (citing AR 259, 341, 343)). The ALJ contrasted this rather sparse evidence of fatigue against the listing's definition of "severe fatigue" requiring "significantly reduced physical activity or mental functioning." (AR 28). In doing so, the ALJ concluded that the "required level of functional deficit is not reasonably consistent with overall evidence." (AR 28).

The ALJ went on to note that the evidence and testimony reflect K.S.'s involvement in "gym class, running, jumping, throwing/catching/kicking/hitting a ball, playing Laser tag, and plans to play basketball and possibly, but not likely, cross-country." (AR 28; *see also* AR 36). The ALJ acknowledged that K.S.'s involvement in these physical activities may result in some level of musculoskeletal discomfort or limitation, but that fatigue was not alleged to be a significant factor. (AR 28 (citing AR 51-53, 56, 59, 138, 159, 162, 311)). Later in her decision, the ALJ additionally considered Sanders's testimony that sometimes she has to carry K.S. upstairs to his bedroom at the end of a day because he cannot walk. (AR 30). The ALJ deduced, however, that these episodes appeared infrequent and not severe, as the episodes were not substantiated by complaints of significant functional deficits in the medical record. (AR 31). The ALJ also noted that K.S. had missed just one day of school in the sixth grade. (AR 31); *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-69 (7th Cir. 2010) ("[T]idy packaging" is not required in ALJs' decisions because the courts read them "as a whole and with common sense." (citations omitted)). Accordingly, the ALJ concluded that while K.S. likely experienced some intermittent episodes of fatigue, the overall evidence and testimony did not reasonably describe a frequent sense of exhaustion resulting in significantly reduced physical or mental functioning as required by the listing. (AR 28).

In challenging the ALJ's characterization of K.S.'s fatigue, Sanders contends that the ALJ failed to consider her testimony that supports a finding of severe fatigue. (DE 19 at 8). She points to her testimony that she has to carry K.S. upstairs sometimes at the end of the day and that some days he wakes up and cannot walk, together with a variety of other statements she made at the hearing. (DE 19 at 8-9 (citing AR 56-57, 60-63)). But contrary to Sanders's assertion, the ALJ *did* expressly consider her testimony concerning K.S.'s difficulty walking, as well as her testimony that he had swelling in his knees, ankles, and feet; that he had "flare-ups" two to three times a week; that he complained his arms felt heavy; that his appetite had decreased; that he does not receive any special services at school other than a teacher keeps his books in the classroom; and that he attends school even though he has pain. (AR 30-32). In fact, the ALJ considered this testimony quite thoroughly, easily fulfilling her duty to minimally articulate her assessment of the evidence. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[A]n ALJ need not mention every piece of evidence, so long [as she] builds a logical bridge from the evidence to [her] conclusion." (citation omitted)). Ultimately, however, the ALJ found Sanders's testimony concerning the severity of K.S.'s symptoms "not entirely credible" (AR 33), a finding that Sanders does not specifically challenge. As such, the ALJ's conclusion that the evidence of record did not reveal "severe fatigue" as required by Listing 114.02(A) is supported by substantial evidence.

Turning to malaise, in the context of the listing "malaise" means "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." 20 C.F.R. § 404, Subpart P, App'x 1, 114.00C(2). The ALJ acknowledged that the evidence and testimony support possible frequent bodily discomfort and

16

reports of illness or lack of well being. (AR 28 (citing AR 304, 317, 326-27, 330, 342-43, 373-74)). The ALJ clarified, however, that clinical assessments of those complaints generally reflect minimal clinical findings of deficits and few descriptions of acute illness. (AR 29 (citing AR 264-65, 267-69, 271-72, 274-75, 277-79; 311-19, 327-28, 330, 334-36, 342-45, 350-51, 374-76)). The ALJ also stated that K.S.'s school records did not reflect a significant number of absences from school. (AR 29 (citing AR 189)). The ALJ additionally considered that once K.S. was diagnosed with SLE, he continuously improved with treatment and reported nearly being back to normal in May 2012. (AR 31-32, 38-39; *see* 257, 261, 264-65, 311, 341, 344-46). As such, the ALJ concluded that the overall evidence and testimony did not support frequent symptoms attributable to malaise that resulted in significantly reduced physical activity or mental function. (AR 29).

Sanders challenges the ALJ's finding concerning malaise, pointing out that not all of K.S.'s physical exams were normal. She emphasizes that some exams showed stiff fingers; wrist or knee pain; swelling in his fingers, elbow, ankle, or knee; poor hand strength; or decreased grip. (*See* DE 32 at 2-3 (citing AR 257-58, 261, 265, 272, 275, 311, 315, 342, 345-46, 351, 374)). She also points to his complaints of pain on various occasions. (DE 32 at 3 (citing AR 234, 257, 264, 313, 327-28, 342, 344, 350, 372)). As such, Sanders contends that the ALJ's "review of the evidence was selective." (DE 32 at 3). The Court disagrees. The ALJ never suggested that all of K.S.'s physical exams were normal; rather, the ALJ indicated that his physical exams generally revealed "minimal clinical findings of deficit along with observations for few descriptions of [K.S.] appearing acutely ill or toxic." (AR 28). That is a fair characterization of the evidence that Sanders cites. As such, the ALJ's conclusion regarding

17

malaise—that K.S.'s bodily discomfort and feelings of illness did not result in significantly reduced physical activity as required by Listing 114.02(A)—is supported by substantial evidence. *See, e.g.*, *Douglas v. Comm'r of Soc. Sec.*, No. 6:11-cv-00043, 2012 WL 5929322, at *3 (W.D. Va. Nov. 7, 2012) (finding that the claimant did not meet the listing for SLE where there were minimal findings on clinical exams and lack of any acute distress).

In her final argument, Sanders contends that the ALJ should have referred the matter of medical equivalence concerning Listing 114.02(A) to a medical expert. Indeed, "[w]hether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart,* 381 F.3d 664, 670 (7th Cir. 2004) (citing 20 C.F.R. § 404.1526(b)). But K.S.'s argument has no traction, as Drs. Roush and Gaddy, the state agency physicians, *did* review the evidence of record and conclude that K.S. did not meet or equal any listed impairment. (AR 68-69, 237-42, 305-10). The ALJ relied upon the assessment of these state agency physicians, who completed Disability Determination and Transmittal forms at the initial and reconsideration levels and concluded that K.S. did not meet or medically equal a listing. (AR 68-69). The Seventh Circuit Court of Appeals has articulated that "[t]hese forms conclusively establish that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (alteration in original) (internal quotation marks and citations omitted). Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts." *Id.* (citation omitted); *see also* SSR 96-6p, 1996 WL 374180, at *2-3 (July 2, 1996).

Perhaps recognizing the vulnerability of her original argument, Sanders attempts to

rehabilitate this argument in her reply brief, asserting that "there was other evidence that came in after the finding of the [s]tate [a]gency physicians." (DE 32 at 3). Sanders then cites to the medical evidence dated after July 2012 (the date of the most recent state agency opinion) that the state agency physicians did not review. (*See* DE 32 at 4). Sanders also revisits her testimony (discussed earlier) about K.S.'s difficulty walking, that he has swelling in his knees, ankles, and feet; that he has "flare-ups" two to three times a week; that he complained his arms felt heavy; that his appetite had decreased; and that he attends school even though he has pain. (DE 32 at 4). Of course, "arguments raised for the first time in a reply brief are deemed waived." *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) (citations omitted). And even if not waived, Sanders's argument is unpersuasive. At the time Drs. Roush and Gaddy completed their reviews, the record included the forms that Sanders completed in connection with K.S.'s application, which summarized her view of K.S.'s symptoms, limitations, and activities of daily living; this evidence is similar to her hearing testimony. (*Compare* AR 159-63, *with* AR 54-66). In that same vein, the medical evidence dated after July 2012 is not significantly different than prior to July 2012. As the Court has already concluded, the ALJ's finding that K.S.'s physical exams generally revealed minimal clinical findings of deficit and few descriptions of K.S. appearing acutely ill is a fair characterization of the record after July 2012.

"When additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding that the claimant's impairments are not medically equivalent to a Listed impairment, the ALJ must call on a medical expert." *A.H. ex rel. Williams v. Astrue*, No. 09 C 6981, 2011 WL 1935830, at *18 (N.D. Ill. May 18, 2011) (quoting SSR 96-6p, 1996 WL 374180 (July 2, 1996)) (internal quotation marks

19

omitted). Here, however, Sanders fails to point to any evidence dated after July 2012 that could materially change Drs. Roush's and Gaddy's opinions. *See Keys v. Berryhill*, —F. App'x—, 2017 WL 548989, at *3 (7th Cir. Feb. 9, 2017) ("It is true that [the state agency doctors] did not review these reports, but [the claimant] has not provided any evidence that the reports would have changed the doctors' opinions."). "If an ALJ were required to update the record anytime a claimant continued to receive treatment, a case might never end." *Id*. (citing *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)). Therefore, Sanders's argument that the ALJ erred by failing to obtain an updated medical opinion from a medical expert concerning medical equivalency after July 2012 is unpersuasive.

In sum, the ALJ's determination that K.S. did not meet or equal Listing 114.02(A), the SLE listing, is supported by substantial evidence. Therefore, the Commissioner's final decision will be affirmed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Sanders.

SO ORDERED.

Entered this 13th day of March 2017.

/s/ Susan Collins  
Susan Collins,  
United States Magistrate Judge